Lucien J. DANDURAND, Plaintiff,

v.

UNUM LIFE INSURANCE COMPANY
OF AMERICA, Defendant.

No. Civ. 00–220–P–C.

United States District Court,
D. Maine.

April 3, 2001.

Graydon Stevens, Kelly, Remmel & Zimmerman, Portland, ME, for Plaintiff.

Patricia A. Peard, Ronald W. Schneider, Jr., Patricia A. Peard, Bernstein, Shur, Sawyer, & Nelson, Portland, ME, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

This case involves a dispute between Plaintiff, Lucien J. Dandurand, and Defendant, Unum Life Insurance Company of America ("Unum"), over Unum's decision to terminate Dandurand's monthly benefits under Group Long Term Disability Insurance Policy No. 379228 (hereinafter "the Policy"), Defendant's Statement of Material Facts (DSMF) (Docket No. 8), Exh. 1, and over Unum's attempt to recoup from Dandurand a sum of $64,800 that Unum alleges was overpaid to him under the Policy. Now before the Court is Defendant's Motion for Partial Summary Judgment with Incorporated Memorandum of Law (Docket No. 7). In this motion, Unum asks the Court to declare reasonable its interpretation of the Policy and assessment of Plaintiff's benefits under the Policy. For the reasons that follow, the Court will grant Defendant's motion in part and deny Defendant's motion in part.

## BACKGROUND

Summary judgment is appropriate when the record reveals no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. *See* FED.R.CIV.P. 56(c). Once the moving party has identified those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any" which "it believes demonstrate the absence of a genuine issue of material fact," the adverse party may avoid summary judgment by providing properly supported evidence of disputed material facts that would require trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The trial court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990).

The following material facts are not in dispute. Dandurand has worked as an employee of Dingley Press since August 1988. *See* Plaintiff's Statement of Material Facts (PSMF) (Docket No. 12) ¶ 1. Dingley Press has a Group Long Term Disability Insurance Policy with Unum. *See* DSMF ¶ 1. As an employee of Dingley Press, Dandurand was an eligible beneficiary of the Policy. *See id.* After becoming inflicted with viral cardiomyopathy in January 1994, Dandurand received disability insurance benefits under the Policy from July 20, 1994, until August 19, 1999. *See* PSMF ¶¶ 2, 10. The disability payments that Dandurand received during this period amounted to $86,234.09. *See id.* ¶ 10. During this period, Dandurand did not work between January 21, 1994, and May 1, 1994, and worked on a part-

time basis with reduced duties after May 2, 1994. *See id.* ¶ 3. Dandurand continues to work for the Dingley Press on a part-time basis with reduced duties. *See id.*

The Policy provides that an insured individual who meets its definition of disability is eligible for a monthly benefit that constitutes the lesser of seventy percent of that individual's basic monthly earnings or the Policy's maximum monthly benefit, minus other income benefits detailed by the Policy. *See* The Policy at L–BEN–1. An individual meets the Policy's definition of disability in one of two ways. Either the individual "cannot perform each of the material duties of his regular occupation" or, "while unable to perform all of the material duties of his regular occupation on a full-time basis," the individual "is performing at least one of the material duties of his regular occupation on a part-time or full-time basis and … earning currently at least 20% less per month than his indexed pre-disability earnings due to that same injury or sickness." The Policy at L–DEF–4. The Policy defines an individual's pre-disability earnings as "the insured's basic monthly earnings in effect just prior to the date his disability began adjusted on the first anniversary of benefits payments and each following anniversary." *Id.* at L–DEF–2. Under the Policy, basic monthly earnings are determined from the box on the insured individual's W–2 form that "reflects wages, tips and other compensation," or, in instances in which a W–2 form was not received, "for the period of employment." *Id.* at L–PS–2. The annual adjustments are "based on the lesser of 10% or the current annual percentage increase in the Consumer Price Index." *Id.* at L–PS–1.

Individuals must undergo an elimination period of 180 days prior to receiving benefits under the Policy. *See id.* The elimination period begins on the first day of the disability. *See id.* at L–DEF–1. The Policy provides for the cessation of disability benefits "on the earliest of: the date the insured is no longer disabled; the date the insured dies; the end of the maximum benefit period; [or] the date the insured's current earnings exceed 80% of his indexed pre-disability earnings." *Id.* at L–BEN–4. The Policy also has a recurrent disability provision, which defines a recurrent disability as "a disability which is related to or due to the same cause(s) of a prior disability for which a monthly benefit was payable." *Id.* The Policy treats recurrent disabilities of individuals who "return[ ] to [their] regular occupation on full-time basis for six months or more" as new disabilities, subject to another elimination period. *Id.* However, individuals who "return[ ] to work on a full-time basis for less than six months" and "perform[ ] all the material duties of [their] occupation" are entitled to the treatment of their recurrent disability as the prior disability. *Id.*

Unum serves as the administrator of the Policy and makes determinations of an individual's eligibility for benefits. *See* DSMF ¶¶ 11, 13. The Policy provides that Unum, "[i]n making any benefits determination under this policy[,] … shall have the discretionary authority both to determine an employee's eligibility for benefits and to construe the terms of this policy." *Id.* at L–PS–2. Although Unum initially determined that Dandurand was eligible for benefits and periodically obtained eligibility documentation from Dandurand between 1994 and 1999, *see* PSMF ¶¶ 8, 11, in 1999, Unum decided that it had miscalculated Dandurand's benefits. *See* DSMF ¶ 11. Unum's error had occurred because Unum had included Dandurand's bonuses in its calculation of his 1993 earnings but had not included his bonuses in its calculations of his post–1993 earnings. *See id.* Upon discovery of this error, Unum recalculated Dandurand's earnings

and eligibility for the years 1994 to 1999. This recalculation led Unum to determine that Dandurand had met the Policy's definition of disability for the years 1994, 1996, and 1999, but had not met the Policy's definition of disability for the years 1995, 1997, and 1998. *See id.* ¶¶ 14–23. Unum also determined that Dandurand had undergone three separate periods of disability and that he was subject to the 180–day elimination period for each disability period. *See id.* ¶¶ 24–25. Based on these determinations, Unum concluded that it had overpaid Dandurand $64,800. *See id.* ¶ 25.[1] Unum decided to recoup its calculated overpayment by offsetting his subsequent monthly benefits. *See* PSMF ¶ 14, 16.

Unum made the following decisions in its 1999 recalculation of Dandurand's 1994–1999 benefits under the Policy.[2] First, Unum concluded that, due to a bonus that he had received from the Dingley Press in 1995, Dandurand had not been disabled within the meaning of the Policy in 1995 because he had not suffered a loss of earnings that exceeded twenty percent of his 1993 basic monthly earnings. *See* DSMF ¶ 11. As a result of this determination, Unum reassessed whether Dandurand had met the Policy's definition of disability in 1996 by comparing his 1996 earnings to his 1995 basic monthly earnings. *See id.* ¶ 16. This recalculation led Unum to conclude that Dandurand had

been disabled within the meaning of the Policy in 1996. *See id.* ¶ 17. Unum viewed this as a new period of disability and applied the Policy's 180–day elimination period to Dandurand's 1996 benefits. *See id.* Unum recalculated Dandurand's 1997 eligibility by comparing his 1997 earnings with his 1995 basic monthly earnings. *See id.* ¶ 18. Significantly, in 1997, the Dingley Press had begun a 401(k) plan, and Dandurand had elected to make contributions to the plan. *See* PSMF ¶ 7. Unum included Dandurand's 401(k) contributions in its recalculation of his 1997 earnings. *See* DSMF ¶ 19. This recalculation led Unum to decide that Dandurand had not met the Policy's definition of disability in 1997. *See id.* ¶ 20. Hence, Unum recalculated Dandurand's 1998 eligibility for benefits, comparing his 1998 earnings to his 1997 basic monthly earnings and again including his 401(k) contributions in its calculation of Dandurand's 1998 earnings. *See id.* ¶ 21. Unum concluded that Dandurand had not been disabled within the meaning of the Policy in 1998. *See id.* By comparing Dandurand's 1999 earnings, including his 401(k) contributions, with his 1998 basic monthly earnings, Unum reassessed Dandurand's 1999 disability status and determined that Dandurand did meet the Policy's definition of disability for that year. *See id.* ¶¶ 22, 23. As it had done for Dandurand's 1996 period of disability, Unum regarded his 1999

---

**1.** The record reflects a history behind Unum's ultimate determination of the amount of overpayment. Dandurand asserts that Unum wrote to him in January 1999 to inform him that it had underpaid him $1,444.10 between July 20, 1996, and January 19, 1999. *See* PSMF ¶ 12. Unum subsequently unilaterally terminated Dandurand's benefits on August 20, 1999, claiming that Dandurand was no longer disabled as defined by the Policy and that he had received an overpayment of $70,859.28. *See id.* ¶ 13. Unum's determination of the $64,800 overpayment came as a result of Dandurand's appeal of Unum's Au-

gust 1999 termination decision, which also resulted in the reopening of his claim. *See id.* ¶ 14.

**2.** Dandurand does not dispute that Unum engaged in the recalculation of his benefits in the manner in which it is described. However, Dandurand does dispute the reasonableness of a number of decisions that Unum made in its recalculation. *See* Plaintiff's Response to Defendant's Statement of Material Facts (Docket No. 12) ¶¶ 15–25.

eligibility as a new period of disability and applied the 180–day elimination period. *See id.* ¶ 23.

## DISCUSSION

Unum has moved for summary judgment on the issue of whether its 1999 recalculation of Dandurand's benefits and interpretation of the Policy was reasonable. Dandurand contests the reasonableness of three decisions made by Unum in its interpretation of the Policy as applied to Dandurand's benefits. First, Dandurand disputes the reasonableness of Unum's decision to compare his 1996 and 1997 earnings with his 1995 earnings, his 1998 earnings with his 1997 earnings, and his 1999 earnings with his 1998 earnings. Dandurand asserts that the only reasonable interpretation of the Policy would require the comparison of his earnings during each of these years with his 1993 earnings. Dandurand also maintains that, under the Policy, it was not reasonable for Unum to include his 401(k) contributions in its recalculation of his 1997–1999 earnings. Third, Dandurand asserts that it was unreasonable for Unum to subject him to three separate elimination periods.[3]

## I. The Standard to Apply in Reviewing Defendant's Interpretation of the Policy, Reassessment of Plaintiff's Eligibility, and Recalculation of Plaintiff's Benefits

██ The role of the trial judge at the summary judgment stage "is ... to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The parties do not dispute that Plaintiff has brought this action pursuant to provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3). In resolving disputes that arise under these provisions, a court should afford deference to the decision of an ERISA plan's administrator when the plan "gives the administrator ... discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). This deference takes the form of the arbitrary and capricious standard of review, and it occurs only when a policy "clearly grant[s] discretionary authority to the administrator." *Rodriguez–Abreu v. Chase Manhattan Bank*, 986 F.2d 580, 583(1993). *See also Terry v.*

---

3. Dandurand does not dispute that his 1995 bonus should have been included in Unum's recalculation of his 1995 earnings.

Dandurand has not cross-moved for summary judgment. However, in his Objection to Defendant's Motion for Partial Summary Judgment with Incorporated Memorandum of Law (Docket No. 11), he asserts that, prior to his receipt of the 1995 bonus, Unum had represented to his employer that the bonus would not affect Dandurand's disability status, *see also* PSMF ¶ 15, and argues that, thus, should the Court conclude that Unum's interpretation of the Policy was reasonable, the equitable doctrine of estoppel should bar Unum from now asserting an overpayment based on this bonus. Unum replies that the reasonableness of its interpretation of the Pol-

icy constitutes the only issue before the Court on its Motion for Summary Judgment and that Dandurand's estoppel argument is not material to this issue. Unum also argues that Dandurand has waived his ability to assert the equitable estoppel defense by failing to plead it, and Unum also contests the merits of Dandurand's equitable estoppel argument. The parties appear to agree that the doctrine of equitable estoppel and the other equity doctrines that Dandurand has asserted against Unum's recoupment of any overpayment involve questions of material fact which cannot be resolved on a motion for summary judgment. The parties have not fully briefed the issue of waiver. The Court will not resolve the issues pertaining to equitable estoppel at this point in the proceedings.

*Bayer Corp.*, 145 F.3d 28, 37 (1st Cir.1998) (finding express grant of authority); *Bellino v. Schlumberger Techs., Inc.*, 944 F.2d 26, 29 (1st Cir.1991) (applying *de novo* review in the absence of express grant of discretionary authority). When a policy's decisionmaker is operating under a conflict of interest, this conflict should be "weighed as a factor in determining whether there is an abuse of discretion." *Firestone*, 489 U.S. at 115, 109 S.Ct. at 957 (quotations omitted). The Court of Appeals for the First Circuit has explained that the fact of an insurance company's dual responsibility of determining eligibility and paying benefits may create "a conflict of sorts," but that competing market incentives minimize this potential conflict. *Pari–Fasano v. ITT Hartford Life and Accident Ins. Co.*, 230 F.3d 415, 418 (1st Cir.2000) (citing *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir.1998)). In instances in which this potential conflict is present, a court must " 'adher[e] to the arbitrary and capricious principle, with special emphasis on reasonableness, but with the burden on the claimant to show that the [insurer's] decision was improperly motivated.' " *Pari–Fasano*, 230 F.3d at 418 (quoting *Doyle*, 144 F.3d at 184). *See also Doe v. Travelers Ins. Co.*, 167 F.3d 53 (1st Cir. 1999). Under this standard, an insurer's decision is arbitrary and capricious if it is unreasonable. *See Pari–Fasano*, 230 F.3d at 419.

The Policy at issue in this case provides that "[i]n making any benefits determination under this policy, the Company shall have the discretionary authority both to determine an employee's eligibility for benefits and to construe the terms of this policy." The Policy at L–PS–2. This language constitutes a clear grant of discretionary authority. Therefore, the arbitrary and capricious standard of review applies, and the Court's resolution of Unum's Motion for Summary Judgment is limited to the question of whether Unum engaged in a reasonable interpretation of the Policy in its recalculation of Dandurand's average monthly earnings and determination that Dandurand underwent three separate periods of disability. As a factor in its reasonableness decision, the Court will keep in mind that Unum had the dual roles of making benefits determinations and paying benefits under the Policy. Dandurand does not identify any other conflict of interest that the Court should take into account in assessing the reasonableness of Unum's recalculation.

## II. The Benchmark Year for Determining Plaintiff's Pre–Disability Average Monthly Earnings

Dandurand advances two arguments in support of his position that Unum's decision to use 1995, 1997, and 1998, instead of 1993, as the benchmark years against which to compare his 1995–1999 earnings in its determination of his disability status was unreasonable. First, Dandurand maintains that Unum's decision constituted an unreasonable application of the Policy's definition of disability. Second, Dandurand argues that it was arbitrary and capricious for Unum to decide not to apply the Policy's recurrent disability provision to treat his continuous engagement in part-time work as one period of disability.

■ The Court will first address Dandurand's argument regarding Unum's application of the Policy's definition of disability. The relevant provision of the Policy's definition of disability contains three prongs: inability to perform all of the material duties of the occupation; performance of at least one of the material duties of the occupation; and earnings of "at least 20% less per month than his indexed pre-disability earnings due to that same injury or sickness." The Poli-

cy at L–DEF–4. It is Unum's application of the last prong of this definition that the parties dispute. Noting that the Policy defines indexed pre-disability earnings as "the insured's basic monthly earnings in effect just prior to the date his disability began," *id.* at L–DEF–2, Unum asserts that it was reasonable for Unum, once it had determined that Dandurand was not disabled in 1995, 1997, and 1998, to regard the basic monthly earnings from these years as Dandurand's indexed pre-disability earnings. Dandurand disputes the reasonableness of this interpretation, urging the Court to focus on the portion of the definitional prong that requires the loss of income to result from the injury or sickness. In essence, Dandurand argues that because he has continuously suffered from the same injury or sickness since 1994, Unum's decision to compare his 1995–1999 earnings to any earnings other than his 1993 earnings fails to account for the full extent to which he lost income as a result of his injury or sickness during those years and, thus, constitutes an unreasonable application of the Policy to his situation.

Having reviewed the relevant Policy provisions, the Court concludes that Unum did not engage in an unreasonable application of the Policy by regarding Dandurand's 1995, 1997, and 1998 basic monthly earnings as his indexed pre-disability earnings. Unum's decision to do this strikes the Court as a straightforward application of the Policy's express language. The Policy sets forth a specific, earnings-dependent definition of disability, and uses the term "disability," rather than "injury or sickness" in its definition of indexed pre-disability earnings. *Id.* at L–DEF–2, L–

DEF–4. Although Dandurand is correct in pointing out that the Policy also identifies causation as a relevant element of its definition of disability and that Unum's recalculation may have failed to assess the full earnings loss that resulted from his injury or sickness, this arguably troubling result does not contradict the Policy's express language of defining disability in terms of loss of *"indexed pre-disability earnings* due to . . . injury and sickness," *id.* at L–DEF–4 (emphasis added), and, therefore, it does not render Unum's application of the Policy arbitrary and capricious.

The Court next turns to Dandurand's argument that, in light of the Policy's recurrent disability provision, it was unreasonable for Unum to treat his disability as three separate periods of disability instead of one continuous period of disability. The Policy's recurrent disability provision defines a recurrent disability as "a disability which is related to or due to the same cause(s) of a prior disability for which a monthly benefit was payable." *Id.* at L–BEN–4. Dandurand relies on the portion of the Policy that provides for the treatment of a recurrent disability as "part of the prior disability" and benefit payments as "subject to the terms of this policy for the prior disability" in cases in which an individual, after receiving disability benefits under the Policy, "returns to his regular occupation on a full-time basis for less than six months" and "performs all the material duties of his occupation." *Id.* at L–BEN–4.[4] Dandurand asserts that he had a recurrent disability and that he never returned to work on a full-time basis. Thus, Dandurand argues, in light of this provision, it was unreasonable for Unum to

---

4. This provision of the Policy goes on to state that "[i[f] an insured returns to his regular occupation on a full-time basis for six months or more, a recurrent disability will be treated as a new period of disability. The insured must complete another elimination period." The Policy at L–BEN–4.

decide not to treat his disability in 1996 and 1999 as part of his prior disability by comparing his 1996–1999 earnings with his 1993 earnings. Unum responds that it was reasonable to conclude that this provision applies only to individuals who return to work on a full-time basis for less than six months and that, because Dandurand had continuously worked part-time since the initial disability determination, this provision of the Policy did not apply to him.

Dandurand's disability claims in 1996 and 1999 did relate to the same cause of his 1993 disability, viral cardiomyopathy, *see* PSMF ¶ 2,[5] and, therefore, Dandurand did suffer a recurrent disability within the meaning of the Policy. *See* The Policy at L–BEN–4. However, the Court holds that Unum did not engage in an unreasonable application of the Policy by deciding not to treat Dandurand's disability in 1996 and 1999 as part of his 1994 disability. The record reflects that Dandurand never returned to work on a full-time basis or performed all of the material duties of his occupation and that he continuously worked on a part-time basis between the years 1994–1999. *See* PSMF ¶ 3. Hence, the provision of the Policy that requires the treatment of a recurrent disability as part of a prior disability does not explicitly apply to Dandurand's situation. Applying this provision of the Policy to cover Dandurand's situation as a continuous part-time worker would involve an extension of the Policy, and it was not arbitrary and capricious for Unum to decline to extend this provision.

## III. The Inclusion of Plaintiff's 401(k) Deferred Compensation

In the years 1997–1999, Unum included the contributions that Plaintiff made to Dingley Press's 401(k) plan as part of his basic monthly earnings. *See* DSMF ¶¶ 19–23. Dandurand argues that this was unreasonable in light of the Policy's explicit definition of basic monthly earnings as "the insured's average monthly earnings as figured: from the W–2 form (from the box which reflects wages, tips and other compensation) . . .; or for the period of employment if no W–2 form was received." The Policy at L–PS–2. Notably, the applicable box on the W–2 form, Box 1, does not include the contributions that Dandurand made to Dingley Press's 401(k) plan. *See* PSMF ¶ 7. Unum did not use this box to calculate Dandurand's current earnings for the years 1997–1999.[6] Instead, Unum used the amount of income reflected in Box 5, which does include the earnings that he contributed to Dingley Press's 401(k) plan. *See id.;* DSMF ¶¶ 19–23. Unum argues that the Policy's definition of disability distinguishes between current earnings and indexed pre-disability earnings and that, while the Policy does refer a decisionmaker to W–2 forms as a measurement of indexed pre-disability earnings, it does not refer the decisionmaker to W–2 forms as a measure-

---

**5.** Unum admits that Dandurand "was inflicted with viral cardiomyopathy and that Dandurand has had that condition since 1994." Defendant's Response to Plaintiff's Statement of Material Facts (Docket No. 15) ¶ 2. However, Unum does dispute Dandurand's assertion that he "has been left permanently partially disabled from a medical standpoint." *Id.* The Court's finding does not rest on the disputed portion of Dandurand's assertion.

**6.** The Court recognizes that in 1999, when Unum conducted the recalculation of Dandurand's eligibility for benefits, the earnings for these years no longer constituted his current earnings. Nevertheless, the relevant earnings within the meaning of the Policy are those that Dandurand had been "currently earning" in the years 1997–1999. The Policy at L–DEF–4. The Court will, thus, use the term "current earnings" to describe the applicable amount.

ment of current earnings. Unum points out that Box 1 on Dandurand's 1997–1999 W–2 forms does not reflect what he had earned during those years, but instead reflects the amount of earnings on which he had paid taxes. Unum maintains that a comparison between the amount of earnings on which Dandurand paid taxes in 1997 and his total earnings in 1996 reflects the earnings that he lost as a result of his decision to participate in the 401(k) plan rather than the loss in earnings that resulted from his injury or sickness. Given the Policy's requirement that the requisite earnings loss occurs as a result of the claimed injury or sickness, Unum contends, it was reasonable to consider the box on Dandurand's W–2 form that also included the earnings that he had contributed to the 401(k) plan. Unum makes the same argument in support of its decision to include Dandurand's 401(k) contributions in its determination of his 1998 and 1999 earnings and calculation of his disability status for these years.

The Court's analysis with regard to the reasonableness of Unum's decision begins with the Policy's definition of disability. As discussed above, the Policy requires a difference of at least twenty percent between the amount that an individual is "earning currently" and his or her "indexed pre-disability earnings," and requires that difference to have been caused by the claimed injury or sickness. *Id.* at L–DEF–4. In defining indexed pre-disability earnings, the Policy refers to the individual's basic monthly earnings. *See id.* at L–DEF–2. It is in the definition of basic monthly earnings that the Policy identifies Box 1 of the W–2 form as the applicable indicator of income. *Id.* at L–PS–2. The Policy does not explicitly contemplate the use of basic monthly earnings to determine what an individual is currently earning, *see id.* at L–DEF–4, presumably because the Policy contemplates the

quarterly assessment of current earnings throughout the year of disability—prior to the issuance of W–2 forms for the year.

The Court holds that it was not unreasonable for Unum to include Dandurand's 401(k) contributions in its determination of his 1997 current earnings. Because Unum engaged in a retroactive determination of Dandurand's disability status under the Policy, it could have used Box 1 of Dandurand's 1997 W–2 forms to calculate his current earnings. Nevertheless, the Policy does not explicitly require Unum to use Box 1 of a W–2 form in its calculation of current earnings, and it was not unreasonable for Unum to determine that Box 5 served as a better indicator of the income loss that occurred as a result of Dandurand's injury or sickness in 1997. However, the Court holds that there is a genuine issue of material fact regarding the reasonableness of Unum's decision to include Dandurand's 401(k) contributions in its determination of his 1998 and 1999 current earnings. The record does not clearly reflect that the comparison between this computation of Dandurand's current earnings and his pre-indexed disability earnings, as determined by Box 1 of his 1997 and 1998 W–2 forms, would accurately assess the amount of earnings that Dandurand lost due to his disability or sickness. Issues of fact remain as to whether this comparison under-represented the amount of earnings he truly lost as a result of his disability. Hence, the Court will deny Unum's motion for summary judgment on the issue of the reasonableness of its method of assessing Dandurand's current earnings for the years 1998 and 1999.

## IV. The Applicability of the 180–Day Elimination Period

Dandurand's argument that Unum engaged in an unreasonable application of the Policy by subjecting him to three elim-

ination periods instead of one period parallels his argument pertaining to Unum's decision to use 1995, 1997, and 1998, instead of 1993, as benchmark years. Citing to the Policy's recurrent disability provision, *see supra* at 36–37 (discussing The Policy at L–BEN–4), Dandurand maintains that Unum should have treated his disability as one period of disability instead of three and, thus, should have subjected him to only one elimination period. For the same reasons discussed in Part II, *supra* at 37, the Court holds that Unum's decision to decline to extend its recurrent disability protection for individuals who return to work on a full-time basis for less than six months to allow Dandurand to avoid the elimination period in 1996 and 1999 was not unreasonable.

## CONCLUSION

For the reasons discussed above, the Court holds that Defendant's decisions to compare Plaintiff's 1996–1999 earnings to his basic monthly earnings of years other than 1993, to regard Plaintiff as having undergone three separate disability periods instead of one, and to include Plaintiff's 401(k) contributions in its calculation of his 1997 earnings were reasonable and were not arbitrary and capricious. The Court holds that genuine issues of material fact remain regarding the reasonableness of Defendant's decision to include Plaintiff's 401(k) contributions in its calculation of his 1998 and 1999 earnings. Therefore, Defendant's Motion for Summary Judgment pertaining to the reasonableness of the interpretation of the Policy will be granted in part by the Court and denied in part by the Court.

Accordingly, the Court **ORDERS** that Defendant's Motion for Summary Judgment be, and it is hereby, **GRANTED** with regard to the reasonableness of Defendant's decisions to compare Plaintiff's 1996–1999 earnings to his basic monthly earnings of years other than 1993, to regard Plaintiff as having undergone three separate disability periods instead of one, and to include Plaintiff's 401(k) contributions in its calculation of his 1997 earnings. The Court **ORDERS** that Defendant's Motion for Summary Judgment be, and it is hereby, **DENIED,** with regard to the reasonableness of Defendant's decision to include Plaintiff's 401(k) contributions in its calculation of his 1998 and 1999 current earnings.